**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| ROCKHILL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | )  No._____ |
| | ) |
| J.M. DRILLING, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW Plaintiff Rockhill Insurance Company ("Rockhill"), by and through counsel, and for its Complaint for Declaratory Judgment states as follows:

**PARTIES**

1. Rockhill is a corporation organized and existing under the laws of the State of Arizona with its principal place of business in the State of Missouri.

2. J.M Drilling, LLC ("JMD") is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business in Jackson, Tennessee. It can be served with process through its registered agent John Moore, 481 Milan Highway, Trenton, Tennessee 38382-9214.

**JURISDICTION AND VENUE**

3. This action is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

4. Rockhill seeks a judgment declaring that it has no duty to defend or indemnify any party under a policy of insurance it issued to JMD for the claims brought in the *Thibodeaux* lawsuit as further described herein below.

5. There is complete diversity of citizenship between Rockhill and JMD and the amount in controversy exceeds $75,000.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201.

7. This action concerns a case of actual controversy over whether Rockhill has a duty to defend and indemnify JMD against the claims in the underlying *Thibodeaux* lawsuit as described further herein.

8. Venue in the Eastern Division of the Western District of Tennessee is proper pursuant to 28 U.S.C. § 1391(b)because JMD's principal place of business is located in Jackson, Tennessee.

### FACTUAL BACKGROUND AND THE POLICY

**The *Thibodeaux* Lawsuit**

9. John and Amy Thibodeaux, individually and on behalf of their minor daughter, Gabrielle Thibodeaux, and Emily Thibodeaux, filed a Petition for Damages in the 15th Judicial Court For the Parish of Lafayette, Louisiana in a lawsuit eventually styled *John Thibodeaux and Amy Thibodeux, Individually, and on the Behalf of their Minor Daughter, Gabrielle Thibodeaux, and Emily Thibodeaux, v. Gulfgate Construction, LLC, Milton Water System, Inc., and Water & Wastewater Utilities, Inc., and J.M. Drilling, LLC,* Case no. 2015-4167 (herein "Thibodeaux

Lawsuit") asserting claims against JMD, among others, arising out of injuries allegedly sustained by John Thibodeaux ("Thibodeaux") as result of a work-related accident occurring on or about June 9, 2015.  A true and correct copy of the Petition for Damages (the "Petition") filed in the Thibodeaux Lawsuit on August 24, 2015, is attached hereto as Exhibit A.

10. On October 8, 2015, Thibodeaux filed a First Amended and Supplemental Petition for Damages (the "First Amended Petition") adding JMD as a defendant to the Thibodeaux Lawsuit and asserting claims against JMD.  A true and correct copy of the First Amended Petition is attached hereto as Exhibit B.

11. On March 14, 2016, Thibodeaux filed a Second Amended and Supplemental Petition for Damages (the "Second Amended Petition") asserting further claims against JMD.  A true and correct copy of Thibodeaux's Second Amended Petition is attached hereto as Exhibit C.

12. On August 5, 2016, Thibodeaux filed a Third Amended and Supplemental Petition for Damages (the "Third Amended Petition"), which did not assert any additional claims against JMD.  A true and correct copy of Thibodeaux's Third Amended Petition is attached hereto as Exhibit D.

13. On March 9, 2017, Rockhill received notice of the Thibodeaux Lawsuit and JMD's potential liability.

14. On August 22, 2017, Thibodeaux filed a Fourth Amended and Supplemental Petition for Damages (the "Fourth Amended Petition"), which asserted further claims against JMD.  A true and correct copy of Thibodeaux's Fourth Amended Petition is attached hereto as Exhibit E.

15.     According to Thibodeaux's Petition, First Amended Petition, Second Amended Petition, Third Amended Petition, and Fourth Amended Petition, Thibodeaux allegedly suffered severe and permanent injuries, incurring past and future medical expenses.  Thibodeaux further alleges that he has suffered a loss of earning capacity, pain and suffering, and loss of enjoyment of life.  Amy Thibodeaux alleges the loss of consortium, services, and society of her husband.  Gabrielle Thibodeaux alleges the loss of consortium, services, and society of her father.  Emily Thibodeaux alleges the loss of consortium, services, and society of her father.  The Thibodeaux petitions allege that the defendants "are liable for all damages set forth herein."

16.     On March 21, 2018, the judge presiding over the Thibodeaux Lawsuit entered an Amended Judgment on Rules (the "Amended Judgment") that granted Thibodeaux's Motion for Summary Judgment on the issue of fault against JMD.  The Amended Judgment granted certain Motions in Limine pertaining to the fault of other named defendants in the Thibodeaux Lawsuit, which, upon information and belief, had the practical effect of attributing all fault to JMD.  The Amended Judgment also granted a certain Motion in Limine regarding comparative fault, which, upon information and belief, had the practical effect of finding that Thibodeaux was not in any way at fault for his injuries.  A true and correct copy of the Amended Judgment is attached hereto as Exhibit F.

17.     The Petition alleges that, on or about June 9, 2015, Thibodeaux was employed by AT&T and was tasked with splicing fiber optic cable in a residential subdivision at "114 Meadow Gate in Sawgrass Subdivision in Lafayette, Louisiana" (the "Lot").  See Exhibit A, ¶ 4.

18. The Petition alleges that Thibodeaux went to the Lot "to work and splice the fiber optic cable in the two hand hole cement/fiberglass boxes" (the "Boxes") that had previously been installed in the ground on the Lot. *See* Exhibit A, ¶ 7.

19. The First Amended Petition alleges that, when Thibodeaux approached the Boxes, there was ankle-deep water on the ground, and he "fell into a hole" that was adjacent to one of the Boxes. *See* Exhibit B, ¶¶ 8-9.

20. The First Amended Petition alleges that, to perform his work, Thibodeaux then "had to lift the heavy lid and place the lid [by one of the Boxes]." *See* Exhibit B, ¶¶ 8-9.

21. The First Amended Petition alleges that, as Thibodeaux was lifting the lid and placing the lid next to one of the Boxes, his "right leg unexpectedly fell into a deep, washed out hole adjacent to [one of the Boxes]." *See* Exhibit B, ¶¶ 8-9.

22. The Petition alleges that, as a result of his leg falling into the hole, "John Thibodeaux has suffered injuries to his right leg and knee, neck, back, hips, and entire body, physically and mental [sic]." *See* Exhibit A, ¶ 10.

23. The Second Amended Petition alleges that JMD was performing work at the Lot in February thru April 2015 that involved JMD "digging and/or trenching at least [a] 38 inch deep trench from [the Boxes] . . . toward the AT & T utility easement near the roadway." *See* Exhibit C, ¶ 31.

24. The Second Amended Petition alleges that, after digging this trench, JMD "dug two 3 foot by 3 foot by 3 foot [sic] diameter holes at the AT & T utility easement so that J.M. Drilling, LLC could directional bore hole drill AT & T underground fiber optic cable right and left from

[the Lot] . . . to other lots and/or homes on Meadow Gate and/or Sawgrass Park." See Exhibit C, ¶ 31.

25. The Third Amended Petition alleges that JMD's negligence "by digging, trenching, and/or directional bore hole drilling at, near, and/or across the underground sewer and/or wastewater pvc pipe located at [the Lot] . . . caused the pipe to leak and/or flood fluid [sic] caused a washout underneath the ground near the [Boxes] . . . at [the Lot] . . . that gave way unexpectedly and without warning when John Thibodeaux was working near the [Boxes] . . . on June 9, 2015." See Exhibit D, ¶ 33.

26. More specifically, the Fourth Amended Petition alleges that, in February 2015, JMD, "while performing work at [the Lot] . . . , negligently pulled up and hooked the underground sewer force main pipe while digging with backhoe [sic]." See Exhibit E, ¶ 39.

27. The Fourth Amended Petition alleges that JMD pulling up on the pipe "caused the underground sewer force main to be pulled out of its connections upstream and downstream." See Exhibit E, ¶ 39.

28. The Fourth Amended Petition alleges that, after hitting the pipe, JMD did not stop work nor did it notify the utility owner of the broken pipe. See Exhibit E, ¶¶ 40-41.

29. The Fourth Amended Petition alleges that JMD decided to "simply discard the pulled up section of pipe and cover up the hole." See Exhibit E, ¶ 41.

30. The First Amended Petition, the Second Amended Petition, and the Fourth Amended Petition make several allegations of negligence against JMD. See Exhibit B, ¶ 11; Exhibit C, ¶ 32, Exhibit E, ¶¶ 39-41.

31. As to fault, in the Amended Judgment, the trial court found that JMD was "at fault for: 1) negligently striking the underground sewer force main line at [the Lot] . . . in February 2015; [and] 2) negligently failing [t]o contact the utility owner . . . to have the broken underground sewer force main line fixed before continuing any work."  *See* Exhibit F.

32. In the Amended Judgment, the trial court found as to causation that "J.M. Drilling LLC's negligence caused [t]he underground void/cavern near [the Boxes] . . . which, in turn, caused John Thibodeaux's accident on June 9, 2015."  *See* Exhibit F.

33. Based upon these findings, the trial court granted Thibodeaux's Motion for Summary Judgment.  *See* Exhibit F.

34. Upon information and belief, a trial is scheduled in the Thibodeaux Lawsuit for March 26, 2018, at which the sole issue to be decided is the amount of damages the Thibodeaux petitioners are entitled to recover from JMD.

**The Policy**

35. Rockhill issued Policy No. FF013178-00 (the "Policy") to JMD for the period of May 2, 2015 to May 2, 2016.  This Policy is a Commercial Follow Form Policy RIC 3701.  A true and correct certified copy of the Policy is attached hereto as Exhibit G and is incorporated herein by reference.

36. As to coverage, the Policy provides in Section I(A):

## I.  INSURING AGREEMENT

We, the Company, in return for the payment of the premium, agree with you, as follows:

**A.** Excess Following Form Liability Over Underlying **Claims Made** or **Occurrence** Coverage

We will pay, on behalf of the insured, the **ultimate net loss** in excess of the amount payable under the terms of any Underlying Insurance as stated in the Schedule of Underlying Insurance, that the insured becomes legally obligated to pay as damages because of injury or damage to which this insurance applies, but only after the Underlying Insurance has been exhausted by payment in full.

This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the Underlying Insurance except as otherwise provided in this policy; provided, however, that in no event will this insurance apply unless the Underlying Insurance applies or would apply but for the exhaustion of its applicable Limit of Liability.

If the Scheduled Underlying Policy affords coverage on a **claims made** basis then for this insurance to apply:

1. the injury or damage must be caused by an **occurrence** that takes place in the **coverage territory**;

2. the claim for the injury or damage must first be made against the insured during the **Policy Period** or the Extended Reporting Period provided herein; and

3. a.  the **bodily injury** or **property damage**; or

   b. the **occurrence** causing the **personal injury**, **advertising injury** or **professional liability** injury;

   must take place on or after the Retroactive Date shown in Item 5 of the Declarations and before termination of this policy;

   If the Scheduled Underlying Policy affords coverage on an **occurrence** basis then for this insurance to apply:

4. the injury or damage must be caused by an **occurrence** that takes place in the **coverage territory**; and

5. a.  the **bodily injury** or **property damage**; or

>    b. the **occurrence** causing the **personal injury**, **advertising injury** or **professional liability** injury;
>
> must take place during the **Policy Period**.

37. As to notice requirements, the Policy provides in Section VI(F) (the "Notice Condition") in pertinent part that:

>    F.   Duties In The Event Of **Occurrence**, Claim Or **Suit**
>
>    1.   You MUST see to it that we and your Scheduled Underlying Insurers:
>
>    a.  are notified in writing as soon as possible of any **occurrence** which may reasonably be believed to result in a claim involving this policy;
>
>    b.  receive notice of the claim or **suit** as soon as possible;

38. In Section VII(20), the Policy defines "ultimate net loss" as follows:

> The total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay by reason of settlement or judgments or any arbitration or other alternative dispute method entered into with our consent or the consent of any underlying insurer.

39. In Section VII(11), the Policy defines an "occurrence," in pertinent part, as follows:

>    a.  an accident, including continuous and repeated exposure to substantially the same general harmful conditions which results in **bodily injury** or **property damage** which is neither expected nor intended from the standpoint of the insured. All such exposure to substantially the same general conditions will be considered as arising out of one **occurrence**;

40. In Section V(21), the Policy contains an exclusion entitled "Subsidence" (the "Subsidence Exclusion"), which provides:

> [The] [P]olicy will NOT apply . . . to any liability, whether direct or indirect, arising out of, caused by, resulting from, contributed to, or aggravated by the subsidence, settling, expansion, sinking, slipping,

falling away, tilting, caving in, shifting, eroding, mud flow, rising, or any other movement of land or earth if any of the foregoing emanate from the operations of the insured or any other person for whose acts the insured is legally liable.

It is further agreed that this insurance shall not become excess of any reduced or exhausted underlying aggregate limit to the extent that such reduction or exhaustion is the result of claims, damage, loss or expense arising out of or in any way related to the above.

41. In an endorsement to the Policy entitled "Residential Contracting – Construction Defect Exclusion," the Policy contains an exclusion (the "Residential Construction Exclusion"), which provides:

> This policy does not apply to any loss, cost or expense, directly or indirectly arising out of or related to the liability of "Contractors" for "Residential Construction".
>
> As used in this exclusion:
>
> "Contractors" means all developers, general contractors, subcontractors, trade persons, organizations, or any other person or entity involved in " Residential Construction".
>
> "Residential Construction" means all development, design, building or other construction, improvements, site selection, surface or subsurface site preparation, or any work, products or component parts thereof or services provided in relation to any of the foregoing, involving property intended in whole or in part for residential habitation. "Residential Construction" does not mean **your work** performed on, or **your product** used in apartments. Apartments do not include condominiums, town houses, or any multi-family dwelling that has been converted into rental units or rented to others, nor does it include apartment buildings or complexes if they have been converted into condominiums or co-operatives.
>
> Notwithstanding the foregoing, "Residential Construction" does not include "non-structural" repair work which is begun after the date of initial occupancy provided such work is unrelated to or not completing work begun prior to the date of initial occupancy. "Non-structural" repair work includes any "Residential Construction" except that which adds or involves a load bearing portion of any

structure or involves any defect that significantly and adversely affects use or utility for residential habitation.

## DECLARATORY RELIEF

42. Rockhill adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as though completely and fully set forth herein.

43. There is an actual, present, and existing controversy between Rockhill and JDM regarding Rockhill's defense and indemnity obligations under the Policy in connection with the Thibodeaux Lawsuit.

44. Rockhill seeks a judicial determination of the parties' rights and duties under the Policy, and this Honorable Court's declaration will confer certainty on the parties and serve the interests of justice.

45. Specifically, Rockhill pleads that, under Tennessee law, it has no duty to defend and indemnify any party in connection with the Thibodeaux Lawsuit.

46. Based on the above alleged facts, Rockhill pleads that no coverage obligation is triggered because the injuries to Thibodeaux were expected or intended such that there was no "occurrence" as defined in the Policy to trigger coverage under the Policy.

47. In the alternative, based on the above alleged facts, Rockhill pleads that the claims asserted in the Thibodeaux Lawsuit are further excluded by the Subsidence Exclusion.

48. In the alternative, based on the above alleged facts, Rockhill pleads that the claims asserted in the Thibodeaux Lawsuit are excluded from coverage under the Policy by the Residential Construction Exclusion.

- 12 -

49. Further, based on the above alleged facts, Rockhill pleads that it has no coverage obligation because JMD failed to provide notice of the Thibodeaux Lawsuit and its potential liability in accordance with the Notice Condition.

50. In addition to the foregoing provisions of the Policy, Rockhill further pleads all other conditions, terms, warranties, limits, definitions and exclusions of the Policy (whether or not expressly mentioned or identified in this Complaint), which also may be found to be applicable as Rockhill's investigation of this matter continues, and Rockhill reserves the right to amend its Complaint for Declaratory Judgment as additional and/or more specific information becomes available.

**WHEREFORE**, Rockhill prays:

A. That process be issued as required by law and the Defendant be served with copies of the Summons and Complaint for Declaratory Judgment;

B. For a declaration by this Honorable Court declaring the rights and obligations of the parties under the Policy, including, but not limited to, a judgment declaring that Rockhill has no duty to defend and indemnify any party for any of the claims asserted in the Thibodeaux Lawsuit; and

C. For such other and further relief as this Honorable Court deems just and proper.

- 13 -

**RESPECTFULLY SUBMITTED** this 23rd day of March, 2018.

            EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.

          By: */s/ Ronald T. Hill*
           **RONALD T. HILL, ESQ., BPR#11283**
           EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
           900 S. Gay Street, Suite 1400
           Knoxville, TN 37902
           (865) 546-0500
           rhill@emlaw.com
           *Counsel for Plaintiff Rockhill Insurance Company*